UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1374

SAMMY GABRIEL,

                    Petitioner,

          v.

MICHAEL B. MUKASEY, Attorney General,

                    Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued: March 19, 2008              Decided: August 14, 2008

Before MICHAEL and GREGORY, Circuit Judges, and Jane R. ROTH,
Senior Circuit Judge of the United States Court of Appeals for the
Third Circuit, sitting by designation.

Petition denied by unpublished opinion.  Senior Judge Roth wrote
the opinion, in which Judge Michael and Judge Gregory joined.

**ARGUED:** Lawrence George Spivak, New York, New York, for Petitioner.
Jem Colleen Sponzo, Office of Immigration Litigation, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**
Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil
Division, M. Jocelyn Lopez Wright, Assistant Director, Office of
Immigration Litigation, Shabana Stationwala, Office of Immigration
Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

ROTH, Senior Circuit Judge:

Sammy Gabriel, a native and citizen of Indonesia, petitions this court for review of the denial of his applications for withholding of removal and relief under the Convention Against Torture.* For the reasons that follow, we deny the petition for review.

I.

Gabriel was born in Indonesia in 1961. He arrived in the United States on November 29, 2000, with authorization to stay until December 21, 2000. Gabriel remained in the United States and applied for asylum and withholding of removal on April 14, 2003.

In the declaration accompanying his application, Gabriel stated that he fears persecution in Indonesia on account of his Christian religion. He declared that in November 1998, he witnessed a mob of Muslims vandalizing and burning a Christian church. Gabriel explained that, as a freelance photographer, he took photographs of the event, but while inside the church he was beaten and forced to give film from his camera to the rioters.

---

*Gabriel also sought asylum, but the Immigration Judge denied his application as time-barred under 8 U.S.C. §§ 1158(a)(2)(B) and (a)(2)(D). Because Gabriel did not challenge application of the time bar on appeal, the Board of Immigration Appeals ruled that he had waived consideration of his asylum claim. Gabriel concedes in his brief that we cannot review the determination of his asylum claim.

Gabriel then left the church and took more pictures, including one of a man wearing a red hat, who had attacked him earlier.

Gabriel also stated that in December 1998 he received threatening telephone calls warning him not to publish the photographs. He reported the calls to the police, who said they would investigate. In January 1999, Gabriel's dog was poisoned, and he received a letter warning him not to do anything if he did not want to die like his dog. Gabriel believed he was being threatened because he had taken the photographs of the church burning. In January 2000, Gabriel and his nephew were physically attacked while walking down a Jakarta street. The nephew was hospitalized and his eye permanently damaged. Gabriel reported the incident to the police. Gabriel believed this incident was also the result of his having taken the photographs. Gabriel stated that he continued to receive threatening calls, even after he moved, until he left for the United States. Gabriel stated that his wife and children remained in Indonesia and continued to receive calls, threatening that his daughter would be kidnaped if Gabriel published the photographs.

On May 28, 2003, the Department of Homeland Security issued Gabriel a Notice to Appear, charging him with removability for having remained in the United States beyond the authorized time period. Gabriel conceded removability and presented his claims for

3

asylum, withholding of removal, and withholding under the Convention Against Torture.

In support of his claims, Gabriel submitted, among other exhibits, a number of photographs that he claimed to have taken of the violence at the church and various articles related to the treatment of Christians in Indonesia. The Department of Homeland Security submitted the 2002 and 2003 Department of State Country Reports on Human Rights Practices for Indonesia.

A merits hearing was conducted before an Immigration Judge on September 9, 2004. At the hearing, the IJ questioned how Gabriel had the photographs that he had submitted, given his claim that the rioters at the church had taken his film, as well as why Gabriel had not given the photographs to the police. Gabriel testified that he still had film after he left the church, so he kept taking pictures. He testified further that he made five copies of the photographs. He said that he gave a copy to the chief journalist and to his younger brother, a church member. He testified that he had not given a copy to the police because the police were also Muslim and could destroy the evidence. When the Immigration Judge asked why Gabriel had not included the details about the copies of the photographs in his declaration, Gabriel said that he could not trust the police.

4

The Immigration Judge also asked Gabriel why he had waited to apply for asylum, given that his family remained in Indonesia. Gabriel testified that he thought that his employer could sponsor him and then his family. He also said that he did not know about asylum until after his green card application was denied.

Gabriel also offered the testimony of an expert on conditions in Indonesia, Andrew Stube. Stube testified about church burnings and violence and discrimination against Christians. He testified that, while the Government of Indonesia was trying to address religious tension, it was still unsafe to be a Christian in Indonesia.

The IJ denied Gabriel's application on December 19, 2005. The IJ determined that Gabriel's asylum claim was untimely. With respect to Gabriel's withholding claims, the IJ concluded that Gabriel was only partially credible, in particular that Gabriel's testimony as to past persecution was not credible. The IJ concluded that Gabriel had likewise failed to show a well-founded fear of future persecution because Gabriel had offered no credible evidence that he would be singled out for persecution should he return to Indonesia and because there were areas in Indonesia where he could relocate. The IJ determined that Gabriel's Convention Against Torture claim similarly failed, as the Indonesian Government was reportedly trying to prevent religious violence and

Gabriel himself had testified as to benefitting from governmental protection.

On appeal, the Board of Immigration Appeals found that the Immigration Judge's adverse credibility finding was not clearly erroneous. The BIA determined that (1) Gabriel failed to explain how he had copies of the photographs apparently taken prior to his entry into the church, given that he claimed that his film had later been taken; (2) Gabriel failed to explain why he filed reports of later attacks with the police but did not trust them for purposes of giving them copies of the photographs; and (3) Gabriel's testimony regarding the delay in filing for asylum was implausible, given that his family supposedly faced continued threats in Indonesia and that he had contact with both an Indonesian Christian congregation and immigration counsel, who would have told him about the availability of asylum. The BIA concluded that, based on his lack of credibility, Gabriel had failed to establish either past persecution or a well-founded fear of future persecution.

The BIA also determined that Gabriel had failed to show that he would more likely than not be tortured if he returned to Indonesia. The BIA noted that Gabriel himself had sought the Government of Indonesia's protection, that State Department reports indicate that the Indonesian Government had actively tried to prevent religious violence, and that there are sizeable areas

within Indonesia where Christians are the majority and where Gabriel could relocate.

Gabriel filed this timely petition for review.

II.

To be eligible for withholding of removal, an applicant must generally prove that his "life or freedom would be threatened . . . on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 C.F.R. § 1208.16(b).  An applicant can establish a presumption that he will face a future threat if he suffered persecution in the past.  Id. at § 1208.16(b)(1).  This presumption may be rebutted if a preponderance of the evidence establishes that country conditions have changed or that the applicant could avoid the threat by relocating to another part of the country and it would be reasonable to expect him to do so.  Id.

Alternatively, an applicant can establish that he will "more likely than not" face future persecution on account of one of the enumerated grounds.  Id. at § 1208.16(b)(2).  An applicant need not show that he would be individually targeted for persecution if he shows that there is "a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant . . . ."  Id. at § 1208.16(b)(2)(I).  However, an applicant cannot establish the requisite likelihood of

7

future persecution if he could reasonably relocate to avoid future threats.  8 C.F.R. §§ 1208.16(b)(2), 1208.16(b)(3).

To obtain protection under the Convention Against Torture, an applicant must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).  Torture is defined as "any act by which severe pain or suffering . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  Id. at § 1208.18(a)(1).  All relevant evidence must be considered in assessing the probability that the applicant would be tortured, including past torture inflicted upon the applicant as well as the ability to relocate.  Id.  at § 1208.16(c)(3).


III.

We review the denial of a request for withholding of removal and relief under the Convention Against Torture for substantial evidence.  Rusu v. INS, 296 F.3d 316, 325 n.14 (4th Cir. 2002) (withholding of removal); Dankam v. Gonzales, 495 F.3d 113, 124 (4th Cir. 2007) (Convention Against Torture).

The substantial evidence standard is a deferential one.  The BIA's findings of fact "'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004) (quoting 8

8

U.S.C. § 1252(b)(4)(B)). Even "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Gonahasa v. INS, 181 F.3d 538, 541 (4th Cir. 1999) (internal quotations omitted).

Administrative credibility findings are also reviewed for substantial evidence. Dankam, 495 F.3d at 120. "An immigration judge who rejects an applicant's testimony on credibility grounds is obliged to offer specific, cogent reason[s] for doing so." Id. at 120-21 (internal quotations omitted). "Inconsistent statements, contradictory evidence, and inherently implausible testimony" are examples of "specific, cogent reasons" for an adverse credibility finding. Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir. 2006) (internal quotations omitted).

Under this standard, the BIA's adverse credibility finding was supported by substantial evidence. Gabriel claimed that he was persecuted in part because he had taken photographs of Muslims destroying a Christian church. The BIA noted various inconsistencies in the evidence that Gabriel submitted with respect to that incident. First, Gabriel testified that he took photographs, then entered the church, where the perpetrators of the violence took his film, and later left the church and continued to take photographs. However, the photographs that he submitted appear to include pictures taken before Gabriel entered the church.

Gabriel did not explain this discrepancy other than to note that he had other film, and the BIA was free to reject this explanation.

Moreover, as the BIA explained, Gabriel's claim that he did not trust the police sufficiently to give them one of the five copies of the photographs of the attack on the church is inconsistent with his testimony that he subsequently reported other incidents (including telephone calls making threats about the photographs).

Finally, the BIA rejected Gabriel's explanation of why he had waited so long to apply for asylum. Contrary to Gabriel's assertion, this finding of implausibility is relevant to his persecution claim in light of his statement that his family had been threatened and continued receiving threats even after he left them behind in Indonesia.

On these facts, we cannot say that any reasonable adjudicator would be compelled to conclude that Gabriel's testimony on each of these points was consistent, plausible, and credible. There was substantial evidence to support the BIA's adverse credibility determination.

Substantial evidence also supports a determination that Gabriel failed to establish that he would more likely than not be persecuted should he return to Indonesia. Having been found not credible regarding the specific acts of past persecution that he claims he suffered, Gabriel asserts that the BIA did not analyze

whether there is a pattern and practice of persecution of Christians in Indonesia. However, while the BIA did not analyze the pattern or practice issue specifically with respect to withholding of removal, it discussed both the treatment of Christians within Indonesia as well as the possibility of relocation with respect to Gabriel's Convention Against Torture claims.

The record in this case does not compel us to conclude that Gabriel would more likely than not be persecuted upon return to Indonesia. While Christians in Indonesia appear to continue to face hardship, recent country reports indicate that the pattern or practice with respect to the treatment of Christians in Indonesia has significantly improved. The State Department's 2003 Country Report on Human Rights Practices and International Religious Freedom Report indicate that the Indonesian government generally respected the constitutional right to worship according to one's own belief, brokered peace agreements between Christians and Muslims, and made some progress in pursuing individuals who carried out attacks purportedly based on religion. The State Department reports also state that interreligious violence decreased in certain provinces.

We have previously held with respect to asylum claims that "[a] State Department report on country conditions is highly probative evidence in a well-founded fear case," such that "[i]n

most cases," a State Department report provides substantial evidence supporting the BIA's determination. <u>Gonahasa</u>, 181 F.3d at 542. The State Department reports in this case suggest that there is not a pattern or practice of persecution of Christians in Indonesia such that Gabriel would more likely than not be persecuted there, and they support the BIA's determination that Gabriel could safely relocate within Indonesia. This finding defeats both Gabriel's withholding of removal and Convention Against Torture claims.

IV.

For the foregoing reasons, the petition for review is

<u>DENIED</u>.